**No. 21-55798**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION,

*Plaintiff-Appellant*,

v.

COUNTY OF SAN DIEGO, ET AL.

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of California
No. 3:21cv912-L-DEB
Hon. M. James Lorenz

_____

## APPELLANT'S CORRECTED REPLY BRIEF
## [Preliminary Injunction Appeal]

_____

Paul J. Beard II
FISHERBROYLES LLP
4470 W. Sunset Blvd., Suite 93165
Los Angeles, CA 90027
Telephone No.: 818-216-3988
Email: paul.beard@fisherbroyles.com

*Attorney for Appellant*
SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ............................................................................1

II.     ARGUMENT....................................................................................2

        A.      SCRHA's Claims Are Justiciable ........................................2

                1.      The Case Is Justiciable Under the Voluntary Cessation Doctrine
                        ...................................................................................2

                2.      The Case Is Justiciable Because the Dispute Is Capable of
                        Repetition Yet Evading Review...................................9

        B.      SCRHA Raises "Serious Questions" About the Moratorium's Legality
                ...........................................................................................11

                1.      The Moratorium Violates the Contracts Clause ......................11

                2.      The Moratorium Violates the Takings Clause.........................16

                3.      The Moratorium Unlawfully Applies Outside the
                        Unincorporated Areas ...............................................22

III.    CONCLUSION...............................................................................23

        CERTIFICATE OF COMPLIANCE ...........................................24

# TABLE OF AUTHORITIES

**Page(s)**

<u>C</u>ASES

*Allied Structural Steel Co. v. Spannaus*
    438 U.S. 234 (1978)............................................................ 14-15

*Apt. Ass'n of L.A. Cty., Inc. v. City of L.A.*
    2021 U.S. App. LEXIS 25539 (9th Cir. Aug. 25, 2021) ................................... 12, 13

*Apt. Ass'n of L.A. Cty., Inc. v. City of L.A.*
    2020 U.S. Dist. LEXIS 212769 (C.D. Cal. 2020) ................................... 12

*Auracle Homes, LLC v. Lamont*
    478 F. Supp. 3d 199 (D. Conn. 2020)................................... 13

*Board of Trustees of Glazing Health & Welfare Trust v. Chambers*
    941 F.3d 1195 (9th Cir. 2019) ................................... 2-4, 8-9

*Brach v. Newsom*
    6 F.4th 904 (9th Cir. 2021) ................................... 3-6, 9

*Calder v. Bull*
    3 U.S. 386 (1798).................................... 21

*Cedar Point Nursery v. Hassid*
    141 S. Ct. 2063 (2021)................................... 19

*Chem. Producers & Distribs. Ass'n v. Helliker*
    463 F.3d 871 (9th Cir. 2006) ................................... 7

*Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.*
    209 Cal. App. 4th 1182 (2012). ................................... 23

*Cocina Cultura LLC v. Oregon Dep't of Admin. Servs.*
    2021 U.S. Dist. LEXIS 162629 (D. Or. Aug. 27, 2021). ................................... 9

*Cortinas v. State of Nevada Hous.*
    2011 U.S. Dist. LEXIS 150131 (D. Nev. 2011). ................................... 18

*City of Dublin v. County of Alameda*
    14 Cal. App. 4th 264 (1993) ................................... 22-23

*County Sanitation Dist. No. 2 v. County of Kern*
   127 Cal. App. 4th 1544 (2005) ..................................................................22

*Elmsford Apt. Assocs., LLC v. Cuomo*
   469 F. Supp. 3d 148 (S.D.N.Y. 2020) ......................................................13

*Energy Reserves Group , Inc. v. Kansas Power & Light Co.*
   459 U.S. 400 (1983) ............................................................................ 15-16

*Equip. Mfrs. Inst. v. Janklow*
   300 F.3d 842 (8th Cir. 2002). ...................................................................16

*Ex parte Pfirrmann*
   134 Cal. 143 (1901). .................................................................................23

*Ex parte Roach*
   104 Cal. 272 (1894). .................................................................................23

*Exxon Corp. v. Eagerton*
   462 U.S. 176 (1983)...................................................................................15

*Farmers Ins. Exchange v. Calif.*
   175 Cal. App. 3d 494 (1985). ...................................................................19

*Fikre v. FBI*
   904 F.3d 1033 (9th Cir. 2018). ............................................................... 6-7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*
   528 U.S. 167 (2000).................................................................................. 4-6

*HAPCO v. City of Philadelphia*
   482 F. Supp. 3d 337 (E.D. Penn. 2020)...................................................13

*Haw. Hous. Auth. v. Midkiff*
   467 U.S. 229 (1984)...................................................................................17

*Heights Apts., LLC v. Walz*
   510 F. Supp. 3d 789 (D. Minn. 2020)................................................. 13-14

*Home Bldg. & Loan Ass. v. Blaisdell*
   290 U.S. 398 (1934)...................................................................................13

*In re Knight*
    55 Cal. App. 511 (1921) ..........................................................................23

*Kelo v. City of New London*
    545 U.S. 469 (2005).................................................. 17, 21-22

*Kingdomware Techs., Inc. v. United States*
    136 S. Ct. 1969 (2016)..........................................................................9

*Knick v. Twp. of Scott*
    139 S. Ct. 2162 (2019)..........................................................................18

*Lingle v. Chevron U.S.A. Inc.*
    544 U.S. 528 (2005)........................................................................17, 19

*Loretto v. Teleprompter Manattan Catv Corp.*
    458 U.S. 419 (1982)................................................. 18, 20-21

*Lucas v. South Carolina Coastal Council*
    505 U.S. 1003 (1992)..........................................................................20

*McCormack v. Herzog*
    788 F.3d 1017 (9th Cir. 2015).. .................................................................6

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) ...............................................................18

*Miller v. Gammie*
    335 F.3d 889 (9th Cir. 2003) ..................................................................3

*Native Vill. of Noatak v. Blatchford*
    38 F.3d 1505 (9th Cir. 1994), ..................................................................8

*Penn Central Transp. Co. v. New York City*
    438 U.S. 104 (1978)..........................................................................20

*Roman Catholic Diocese of Brooklyn v. Cuomo*
    141 S. Ct. 63 (2020)...................................................... 3-6, 8

*Rosebrock v. Mathis*
    745 F.3d 963 (9th Cir. 2014) ..................................................................7

*Sveen v. Melin*
   138 S. Ct. 1815 (2018) ........................................................................ 12, 14

*Tandon v. Newsom*
   141 S. Ct. 1294 (2021) .......................................................................... 4, 9

*United States Trust Co. of N. Y. v. New Jersey*
   431 U.S. 1 (1977) ....................................................................................... 14

## <u>Constitutional Provisions</u>

Cal. Const., art. XI, § 7 ........................................................................ 22-23

U.S. Const. amend. V .................................................................................. 16

## <u>Federal Statutes</u>

28 U.S.C. § 2201(a) .............................................................................. 17-18

## <u>State Statutes</u>

Cal. Gov. Code § 8634 ........................................................................... 22-23

## <u>Ordinances</u>

Ordinance 10724 .................................................................................*passim*

## I.    INTRODUCTION

The answers of Appellee County of San Diego and Intervenor (collectively, "County"[1]) fall short of defeating the appeal of Appellant Southern California Rental Housing Association ("SCRHA").

First, SCRHA's challenge is justiciable. Beyond the ongoing effects of the Ordinance 10724, the County has failed to establish that its "voluntary cessation" of the moratorium—the Ordinance's expiration—is permanent and will not recur. Further, given the extraordinarily short duration of the Ordinance, and the fact that the County continues to labor under a local health emergency, the constitutionality of the County's action is capable of repetition yet evading review.

Second, SCRHA has established serious questions about the Ordinance's constitutionality, and has made an adequate showing of irreparable harm, and that the balance of equities and the public interest weigh in favor of preliminary relief.[2] None of the County's arguments to the contrary has merit.

---

[1] The Answer Briefs of Appellee County of San Diego and Intervenor-Appellee Alliance of Californians for Community Empowerment Action substantially overlap. Thus, for ease of reference, both will be referred to collectively as "County." Citations to their briefs will be in the following form: "County Ans. Br." and "Int. Ans. Br."

[2] Given the page limitations for replies, and the fact that SCRHA is required to respond to two Answer Briefs, SCRHA limits its Reply Brief only to key arguments made in the Answer Briefs. The absence of a reply as to a particular issue should not be deemed as a concession or waiver with respect to said issue.

The Court should reverse the district court's decision and instruct it to issue a preliminary injunction.

## II. ARGUMENT

### A. SCRHA's Claims Are Justiciable

For the reasons stated in SCRHA's Opening Brief, a live controversy persists, even following the Ordinance's expiration, because the Ordinance has ongoing effects. AOB at 15-16. But even if it didn't, SCRHA's claims would still be justiciable under the voluntary cessation doctrine and/or the rule governing disputes capable of repetition but evading review. This reply brief focuses on the County's mootness defense.

### 1. The Case Is Justiciable Under the Voluntary Cessation Doctrine

The County contends that SCRHA's claims are moot because it voluntarily ceased the moratorium after the Ordinance expired in August. County Ans. Br. at 18-20; Int. Ans. Br. at 11-12. The County's attempt to skirt the voluntary cessation doctrine fails.

First, the County claims that, because it is a government defendant, its voluntary cessation of the illegal moratorium (through the Ordinance's expiration) entitles it to a presumption of mootness that SCRHA has the burden of rebutting. County Ans. Brief at 18-20. The County cites *Board of Trustees of Glazing Health & Welfare Trust v. Chambers*, 941 F.3d 1195 (9th Cir. 2019). There, the Court *en banc* sought to reconcile its "somewhat inconsistent" approach to mootness over the years, ultimately deciding to accord government defendants (but not private

ones) a presumption of mootness when they voluntarily cease an unlawful act. *Id.* at 1199. According to *Chambers*, "[t]he party challenging the presumption of mootness need not show that the enactment of the same or similar legislation is a 'virtual certainty,' only that there is a reasonable expectation of reenactment." *Id.* at 1199.

But the mootness doctrine has evolved since that decision, thanks largely to the sweeping and unprecedented government responses to Covid that have implicated basic constitutional rights. In the more recent decision of *Brach v. Newsom*, 6 F.4th 904, 917 (9th Cir. 2021), also involving a challenge to Covid-related restrictions, a panel of this Court acknowledged the intervening change in the law.[3] It concluded that its "analysis of mootness . . . is framed by the Supreme Court's recent decision in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 208 L. Ed. 2d 206 (2020)."

*Roman Catholic* involved a challenge to the State of New York's system of Covid-related restrictions on religious services. When, by operation of law and in the midst of litigation, circumstances changed to allow plaintiffs' religious services to occur at greater capacity, the Supreme Court refused to find the plaintiffs'

---

[3] The *Brach* panel correctly followed later United States Court precedent, even if in conflict with an earlier *en banc* decision of this Court. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) ("[W]here the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled.").

challenge moot and deny injunctive relief, because "[t]here is no justification for that proposed course of action." *Id.* at 68. Had *Chambers*' presumption of mootness and burden-shifting favoring government defendants applied, the Court instead would have asked whether any justification—*provided by the plaintiff*—existed to overcome said presumption and grant relief. Indeed, in concluding that "[i]t is clear that this matter is not moot," the Supreme Court cited *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000). *Roman Catholic*, 141 S. Ct. at 68. *Friends* famously states the stringent burden that a defendant, government or private, must clear to establish mootness on the basis of voluntary cessation: "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies ***with the party asserting mootness***." *Friends*, 528 U.S. at 189 (emphasis added)[4]; *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) ("[E]ven if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case.").

The panel in *Brach* followed suit, placing the burden squarely on the government defendant—the State of California—to establish that its voluntary cessation of a school-closure order would not be repeated. Citing *Friends*, the majority held:

---

[4] The Supreme Court's reliance on *Friends* dispenses with the County's claim (County Ans. Br. at 19) that the stringent standard for establishing mootness applies only to private defendants.

4

> To establish mootness in such circumstances, the defendants bear the heavy burden of demonstrating that there is no reasonable expectation that the wrong will be repeated. California has failed to carry that heavy burden here.
>
> . . .
>
> Because the voluntary session doctrine applies in this case, the question is whether the State has carried its formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur. California has failed to do so.

*Id.* at 918-19 (internal citation and quotation marks omitted).

Judge Hurwitz dissented. However, with the majority, he acknowledged that the State had the burden of establishing its illegal conduct would not recur. It was not the *plaintiffs'* burden to show that it would. *Id.* at 938 (Hurwitz, J., dissenting) ("On the record before us, the State has plainly met its burden of demonstrating that the challenged conduct—closure of the Plaintiffs' schools—is not reasonably likely to recur.").[5] The *Brach* majority and dissenting opinions on this point are

_____

[5] The County attempts to distinguish *Brach* and *Roman Catholic* on the grounds that they involved continually changing "frameworks" throughout the litigation, while the Ordinance "did not tighten, loosen, or otherwise change" throughout this case. County Ans. Br. at 19. First, the Ordinance *did* change within just three months of the challenge being filed; by design, it expired long before it could ever be judicially reviewed on the merits. Further, there is nothing to stop the County from reinstating the Ordinance's moratorium—and, in fact the County boldly asserts its power to do so. Second, the distinction the County tries to draw is entirely irrelevant. Whether, when, and how a defendant modifies its wrongful behavior may help answer whether "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends*, 528 U.S. at 190. But those questions have nothing to do with legal presumptions or burdens of proof. And nothing in *Brach* or *Roman Catholic* suggests otherwise. Binding precedents make clear that the *defendant*—whether government or private—has the

consistent with other panel decisions of this Court which make clear the government defendant must show the changed behavior is "entrenched" and "permanent." *See, e.g.*, s*ee also Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018); *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015).

**Second**, the County makes no serious attempt in its Answer Brief to meet the "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"—or that its changed behavior is "entrenched" or "permanent." *Friends*, 528 U.S. at 190; *Fikre*, 904 F.3d at 1037. The County makes much of the fact that, since the Ordinance's expiration in August, the Board of Supervisors has met numerous times, and "renewal or reenactment has not been agendized or even proposed." County Ans. Br. at 20. And it dismisses SCRHA's arguments about the moratorium being reenacted as "speculation." *Id.* at 19; s*ee also* Int. Ans. Br. at 12 (same). But it never says it will *not* reenact the eviction moratorium in the future. The County's "coy assertion that it is 'speculative' whether it might" reinstate the moratorium "again merely underscores [the County's] refusal even to say it *will not* do so." *Brach*, 6 F.4th at 920 (emphasis in original). The County gives the Court no reason to believe the lifting of the eviction moratorium—through the Ordinance's expiration—is permanent.

---

"formidable burden" of establishing that its voluntary cessation will not recur. *Friends*, 528 U.S. at 190; *Roman Catholic*, 141 S. Ct. 68.

To the contrary, SCRHA's members have suffered greatly under the Ordinance (ER 33, 36, 39), and they are under the constant threat that the County will enact the same or similar moratorium. As the County readily concedes, it remains under a 20-month-old, "local health emergency" related to Covid, with no end in sight. County Ans. Br. at 5-6. "The pandemic continues to take its toll." *Id.* at 6. Indeed, Covid conditions in the County were better just before and at the time of the Ordinance's passage than they have been in recent months (SCRHA's Motion for Judicial Notice, Exh. D), and there is no indication conditions will improve with the arrival of Winter and the flue season. Importantly, as reflected in its Answer Brief, the County zealously defends the Ordinance and its general power to impose sweeping restrictions on rental housing owners, and it is utterly unsympathetic to the plight of those owners. "[A] claim is not moot if the government remains practically and legally free to return to [its] old ways despite abandoning them in the ongoing litigation"—and here, the County remains both practically and legally free to do so, without an injunction. *Fikre*, 904 F.3d at 1039.[6] In sum, the County cannot overcome its heavy burden of establishing

---

[6] Intervenors' reliance on *Fikre* for the proposition that a "statutory change" is "usually enough to render a case moot" is misplaced. Int. Ans. Br. at 11. First, for mootness purposes, this Court's precedents have distinguished between changes to statutes—i.e., state laws passed by legislatures—and changes to local ordinances, which have been presumed to be easier for city councils and boards of supervisors to accomplish. *See, e.g.*, *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014). Thus, the sentence from *Fikre* that Intervenors quote has no application here. Second, even if it did, *Fikre* relied on two precedents whose validity is in question: *Chem. Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 878 (9th Cir. 2006)

mootness, and injunctive relief is appropriate. *Roman Catholic*, 141 S. Ct. at 68 (holding that the "constant threat" of reimposition of the challenged regulation justifies injunctive relief).

---

and *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1510-11 (9th Cir. 1994), both of which established a significantly "high burden for overcoming the presumption of mootness." Those two cases were likely overruled by *Chambers*, 941 F.3d at 1199, which charted a middle road on mootness. In any event, as described above, precedents since *Chambers* indicate government defendants are not entitled to any such presumption, and the heavy burden lies with them (as with private defendants) to establish a change in unlawful conduct is permanent and entrenched, and will not recur.

### 2. The Case Is Justiciable Because the Dispute Is Capable of Repetition Yet Evading Review

The County argues that, after *Chambers*, the "capable of repetition" standard does not apply to challenges to ordinances that have expired during litigation. County Ans. Br. at 20. It cites an Oregon district court case: *Cocina Cultura LLC v. Oregon Dep't of Admin. Servs.*, 2021 U.S. Dist. LEXIS 162629 (D. Or. Aug. 27, 2021). *Cocina Cultura* says no such thing. And, in any event, the decision fails to take into account the repudiation of *Chambers* in *Roman Catholic*, *Tandon*, and *Brach*.

On the merits of SCRHA's "capable of repetition" argument, the County falls short. A case is not moot "where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016). The County does not seem to dispute that the challenged action—i.e., the County's imposition of a draconian eviction moratorium—is too short in duration to be fully litigated prior to expiration. No federal court can render a final judgment on the merits of a challenge to such a moratorium in 68 days. Instead, the County seems to argue that *other* government actors might in the future pass similar laws of longer duration so that the underlying "issues" may someday serve as a "proxy" vehicle for judicial review. County Ans. Br. at 21. Such speculation does not meet the first prong, which focuses on whether the *County*'s moratorium will evade review.

9

The second prong considers whether there is a reasonable expectation that SCRHA and its members will be subject to the same action again. There is. The County itself underscores the continued local health emergency due to Covid, which is the basis for the Ordinance. County Ans. Br. at 5-6. Covid statistics are worse today than they were in May, when the County used then-current Covid conditions to justify the ordinance. SCRHA's Mot. for Judicial Notice, Exh. E. And, throughout its brief, the County defends its power to enact such a sweeping eviction moratorium, and certainly does not deny its ability and right to do so in the future. On these facts, SCRHA has every reason to expect it will face the same or similar law in the future, as "[t]he pandemic continues to take its toll." County Ans. Br. at 6.

The circumstances here are similar to those highlighted by Justice Gorsuch, in his concurring opinion in *Roman Catholic*:

> It has taken weeks for the plaintiffs to work their way through the judicial system and bring their case to us. During all this time, they were subject to unconstitutional restrictions. Now, just as this Court was preparing to act on their applications, the Governor loosened his restrictions, all while continuing to assert the power to tighten them again anytime as conditions warrant. So if we dismissed this case, nothing would prevent the Governor from reinstating the challenged restrictions tomorrow. And by the time a new challenge might work its way to us, he could just change them again. The Governor has fought this case at every step of the way. To turn away religious leaders bringing meritorious claims just because the Governor decided to hit the "off" switch in the shadow of our review would be, in my view, just another sacrifice of fundamental rights in the name of judicial modesty.

*Roman Catholic*, 141 S. Ct. at 71-72 (Gorsuch, J., concurring).

As in *Roman Catholic*, and for the same reasons, the Court should find that this case is not moot and provide injunctive relief.

**B.   SCRHA Raises "Serious Questions" About the Moratorium's Legality**

SCRHA claims that the Ordinance's eviction moratorium violates the Contracts and Takings Clauses of the U.S. Constitution, and exceeds the County's authority under the California Constitution, insofar as it applies outside the County's unincorporated areas. As detailed below, SCRHA raises serious questions about the moratorium's legality on one or more of these grounds.

**1.   The Moratorium Violates the Contracts Clause**

Among COVID-19 related eviction laws across the country, the County's eviction moratorium is unmatched in the violence it does to existing contractual relations between landlord in tenant. For all practical intents and purposes, it bars all evictions in the County and thereby eliminates contract rights contained in rental agreements. ER 45 (Ordinance § 3(b)-(c)). An owner is barred from moving himself or his family into his property. He must suffer breaches of the rental agreement, including a tenant's harassing, disruptive, and nuisance-creating conduct. And, while the moratorium purportedly allows eviction of a tenant posing a "hazard to the health and safety of other tenants or occupants," the term "hazard" is undefined. *Id.* (Ordinance § 2(b)). Worse, even a "hazardous" tenant (however defined) is protected against eviction if, among other things, his eviction would "risk . . . potential spread of coronavirus." *Id.* That's a scientific call that the owner must make before deciding whether to evict a dangerous tenant. Since most rental housing owners are not epidemiologists with the requisite qualifications to assess

11

the risk of disease transmission associated with an eviction, and given the enormous criminal and civil liability that owners face for making the wrong call, the moratorium is functionally a total ban on evictions.

The moratorium indefinitely suspends various contract rights, including owners' rights to manage, repossess, and protect the integrity of their properties, and owners remain helpless under the Ordinance to safeguard those rights for an indefinite period of time. Significantly, no owner could have guessed those rights would be suspended at 14 months after the start of the pandemic, as conditions were improving, and just days before the state stay-at-home order was lifted. If the County's moratorium does not completely "undermine[] the contractual bargain, interfere[] with a party's reasonable expectations, and prevent[] the party from safeguarding or reinstating his rights," it is difficult to imagine what law would. *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). At a minimum, the total ban interferes with owners' "reasonable expectations," for "no amount of prior regulation" of the landlord-tenant relationship before COVID-19 "could have led landlords to expect anything like the blanket Moratorium" the County enacted. *Apt. Ass'n of L.A. Cty., Inc. v. City of L.A.*, 2020 U.S. Dist. LEXIS 212769, *12 (C.D. Cal. 2020), *aff'd on other grounds in* 2021 U.S. App. LEXIS 25539, *17 (9th Cir. Aug. 25, 2021) (declining to decide whether law substantially impaired contract, because holding that it appropriately and reasonably advanced a significant and legitimate public purpose).

The County cites decisions that have upheld COVID-19 related eviction moratoria against Contracts Clause challenges. But, in Contracts Clause cases,

"[e]very case must be determined upon its own circumstances." *Home Bldg. & Loan Ass. v. Blaisdell*, 290 U.S. 398, 430 (1934). What the County conveniently omits about the cited district court cases is that they involved comparatively modest eviction moratoria. None of the moratoria indefinitely banned all evictions, like the County's ordinance does. *See, e.g., Heights Apts., LLC v. Walz*, 510 F. Supp. 3d 789, 797-98 (D. Minn. 2020) (Minnesota Governor's executive orders—issued between March and July 2020—allowing eviction of (a) tenants seriously endangering safety of anyone on the premises, not just tenants; (b) tenants refusing to relinquish unit to allow owner or owner's family to move in; (c) tenants engaged in unlawful conduct (even if not endangering anyone's safety); and (d) tenants who damage property); *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 159 (S.D.N.Y. 2020) (challenge to New York Governor order issued in May 2020 temporarily disallowing only evictions for nonpayment of rent, with court stressing that the order "did nothing to impede the commencement of holdover proceedings brought when a tenant fails to cure a violation of the terms of the lease"); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 345-47 (E.D. Penn. 2020) (challenge to city moratorium—enacted in July 2020—barring only evictions of tenants with COVID-19 financial hardship); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 209-11 (D. Conn. 2020) (same). Even this Court's recent decision in *Apt. Ass'n of L.A. Cty.*, 2021 U.S. App. LEXIS 25539, ** 8-10, involved a city law that did not ban—for all intents and purposes—*all* evictions, like the Ordinance here.

Finally, the County claims that, under the Ordinance, an owner has other remedies to deal with problematic tenants, such as obtaining a restraining order or

13

calling law enforcement. But the question is whether the moratorium has substantially impaired the contractual relationship between landlord and tenant, via the suspension of contract rights; the question is not whether there are other ways—outside that contract—to address problematic tenants. In any event, restraining orders and police calls are no substitute for the contract right of eviction when repossession of one's property is necessary for reasons other than harassment or violence (e.g., to substitute a nonpaying tenant with a paying one, to move oneself or one's family into the property, etc.).

The County cannot escape the reality that its moratorium works a severe impairment on contracts. Nor has the County met its burden of establishing that the moratorium is "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (internal citation and quotation marks omitted). As the district court in *Heights Apts.* observed, "[t]o completely prohibit evictions would not reasonably advance the state's interest in protecting public health." *Heights Apts.*, 510 F. Supp. 3d at 809. Here, the moratorium prohibits all evictions, with a vague exception that the County drafted in such a way as to be utterly unfeasible and prohibitively risky for owners to invoke.

Moreover, the Supreme Court's precedents make clear that a substantial impairment is unreasonable when "an evident and more moderate course would serve [the government's] purposes equally well." *United States Trust Co. of N. Y. v. New Jersey*, 431 U.S. 1, 31 (1977); *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978) (analyzing whether impairment of private

14

contracts "was necessary to meet an important general social problem"). The County's stated purpose for the moratorium is to provide "housing security" to County residents "to prevent the spread of COVID" associated with "homelessness." County Ans. Br. at 7-8. Yet the moratorium indiscriminately requires owners to house all tenants, regardless whether such tenants are suffering a financial hardship, are at risk of homelessness, or are vaccinated or otherwise vulnerable to COVID transmission. Instead of taking a bulldozer to owners' contract rights, the County could have served its alleged purpose equally well by providing rental assistance for economically vulnerable tenants requiring new housing following otherwise-lawful evictions, or at a minimum suspend evictions only for economically vulnerable tenants who can establish financial hardship.

Given how sweeping the moratorium is, with no regard for its stated objective, the moratorium can "hardly be characterized . . . as one enacted to protect a broad societal interest rather than a narrow class" (here, tenants). *Allied Structural*, 438 U.S. at 248-49. Indeed, the moratorium is the quintessential "special interest legislation," as evidenced by the fact that it passed by a bare majority against near-unanimous opposition among rental housing owners and two Supervisors, and was designed, not to address a "broad and general social or economic problem," but to benefit a discrete class of persons by directly "adjust[ing] the rights and responsibilities of contracting parties." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 192 (1983); *see also Energy Reserves Group v. Kan. Power & Light Co.*, 459 U.S. 400, 407 & n.6 (1983) (discussing the features of "special interest" legislation, including the breadth and strength of support among

15

interest groups and political representatives). "[S]uch special interest legislation runs afoul of the Contract Clause when it impairs pre-existing contracts." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002). If this law were reasonably addressing a broad and general social or economic problem, one would have seen broad support across diverse stakeholders in the County. *Energy Reserves*, 459 U.S. 40 at 407 n.6 (holding law was not special interest legislation, given it found support among diverse interests, and was enacted by "substantial margins" in both houses).

In sum, the County has not shown—and cannot show—that its moratorium is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

## 2. The Moratorium Violates the Takings Clause

The County makes four arguments against the Takings Clause claim, but none of them has merit. First, the County argues that the Takings Clause bars only takings without just compensation. Therefore, the County reasons, SCRHA's only remedy is just compensation in the form of money damages, and equitable relief is unavailable. The argument reflects a basic misunderstanding of SCRHA's takings claim and of takings law generally.

SCRHA challenges the moratorium on the grounds that it violates two separate requirements of the Takings Clause—(1) that the taking be for a "public use," and (2) if the taking is for a public use, that the plaintiff be awarded "just compensation." U.S. Const. amend. V (Takings Clause). As to the first requirement, a taking for a private use is void, and therefore subject to declaratory

16

and injunctive relief. *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."); *Kelo v. City of New London*, 545 U.S. 469, 477 (2005) ("[I]t has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation" (emphasis added)); *id.* at 490 (Kennedy, J., concurring) ("Transfers [of property rights] intended to confer benefits on particular, favored private entities, and with only incidental or pretextual public benefits, are forbidden by the Public Use Clause." (emphasis added)). As the United States Supreme Court has made clear, "[i]f a government action is found to be impermissible . . . because it fails to meet the 'public use' requirement . . . that is the end of the inquiry, and '[n]o amount of compensation can authorize such action.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) (internal citation and quotation marks omitted); see also 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").

SCRHA's alternative ground for an unlawful taking presupposes the moratorium indefinitely destroys owners' property rights for a "public use," and argues that the moratorium provides no means of securing compensation prior to or at the time of such taking. The Declaratory Judgment Act easily authorizes the Court to "declare the rights and other legal relations" of owners vis-à-vis the

County, including whether the moratorium effects an uncompensated taking for public use. 28 U.S.C. § 2201(a).

Declaratory relief is proper, "whether or not further relief" (such as just compensation) "could be sought." *Id.*; *see also Loretto v. Teleprompter Manhattan Catv Corp.*, 458 U.S. 419, 426 (1982) (declaring statute authorizing cable company to install cable box on private property effected "a permanent physical occupation" that was "taking" requiring compensation). The same holds for takings claims for injunctive relief, when the plaintiff claims irreparable harm—or, if he claims damages, the challenged law or action lacks the government's "pledge of reasonably prompt ascertainment and payment" of compensation. *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2185 (2019) (Kagan, J., dissenting) (internal citation and quotation marks omitted); *id.* at 2177 (holding "there is no basis to enjoin the government's action effecting a taking" only if "adequate provision for obtaining just compensation" does not "exist"). Here, rental housing owners have suffered irreparable harm associated with the complete loss—however temporary—of their constitutional property rights in their units, so that injunctive relief is available. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"); *see also Cortinas v. State of Nevada Hous.*, 2011 U.S. Dist. LEXIS 150131, *4 (D. Nev. 2011) ("Losing one's home and property to foreclosure may undoubtedly constitute irreparable harm," "because the attributes of real property are unique" (internal citation and quotation marks omitted)). Further, even if owners sought just compensation for their loss, the moratorium lacks any

18

mechanism whatsoever for "prompt ascertainment and payment" of such compensation. Indeed, in California, "[t]he state's police power, exercised in an emergency to protect the public interest, provides a cloak of absolute immunity from liability" against compensation claims for takings. *See, e.g., Farmers Ins. Exchange v. Calif.*, 175 Cal. App. 3d 494, 503 (1985).

Most recently, the Supreme Court reaffirmed the existence of a taking claim for equitable relief, declaring a California statute unconstitutional under the Takings Clause and enjoining its enforcement. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2080 (2021) (holding, in challenge for equitable relief only, that state law requiring agricultural employers to grant access to their properties to union organizers violated employers' fundamental right to exclude and "constitute[d] a per se physical taking"); *id.* 2089 (Breyer, J., dissenting) (acknowledging that takings claimants "seek only injunctive and declaratory relief"). The County does not address this feature of *Cedar Point*.

Second, citing one district court opinion out of Pennsylvania, the County claims SCRHA will not be irreparably harmed if the Court does not grant injunctive relief. SCRHA has explained—at great length—the irreparable harm that has accompanied the moratorium's destruction of owners' property rights. ER 33, 36, 39. Regardless, declaratory relief can appropriately remedy violations of the Public Use and Just Compensation Clauses, and an injunction is appropriate to remedy the moratorium's violation of the Public Use Clause, as described above. *Lingle*, 544 U.S. at 543.

19

Third, the County claims SCRHA is unlikely to succeed on the merits for two reasons: (1) there is no taking under the Supreme Court's decisions in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), or *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), and (2) if there is a taking, it's for a "public use." The County fails on both counts.

Notably, the County ignores the principal theory on which SCRHA claims a taking: The moratorium effects a per se taking under Loretto, because it requires an owner to indefinitely suffer a "physical occupation" without his consent. *Loretto*, 458 U.S. at 426. Indeed, under the moratorium, the owner indefinitely loses all rights to control, manage, or repossess the entire rented property under the moratorium. It is far more severe than New York law in *Loretto*, which required landlords to suffer the presence of cable boxes on their properties. On this ground alone, the Court should reject the County's claim that SCRHA is unlikely to succeed on the takings claim; SCRHA has raised serious questions about the moratorium's constitutionality under *Loretto*.

Assuming arguendo the moratorium does not effect a per se taking, it certainly at least effects a regulatory taking under *Lucas* or *Penn Central*. Under *Lucas*, the moratorium deprives owners of all "economically beneficial" or "viable" use of their properties because the moratorium strips owners of the only means of securing payment for the leaseholds: eviction. At a minimum, the moratorium results in a taking under *Penn Central*, which requires a balancing of factors, because: (1) the moratorium's "economic impact" on rental housing owners is devastating, given it eliminates owners' right to lawfully repossess

20

property, even for nonpayment of rent or to move themselves and/or their families into a property; (2) the extent to which the Ordinance has interfered with distinct investment-backed expectations, based on existing law and rental agreements, is substantial; and (3) the character of the County's action—enactment of a law that confers no reciprocity of advantage, but rather penalizes owners to the exclusive benefit of tenants—weighs decisively in favor of finding a taking.

Finally, the County's self-serving declaration that its taking is for a "public use" finds no support in fact or law. The moratorium nakedly transfers property rights from one group of citizens (owners) to another (tenants). Landlords may be title owners of their properties, but they have no right to control, manage, use, repossess, or exclude third parties (including tenants) from those properties. Conversely, tenants have the indefinite right to use and occupy said properties, regardless of their conduct, offenses, or payment of rent. Importantly, they indefinitely enjoy the right to exclude—even the owners. The right to exclude is so fundamental that, when the government "takes" it, it "does not simply take a single 'strand' from the 'bundle' of property rights; it chops through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435. If the moratorium is not "a law that takes property from A and gives it to B" to effect an illegal private taking, it's hard to imagine a law that could. *Calder v. Bull*, 3 U.S. 386 (1798); *Kelo*, 545 U.S. at 477 (same). Significantly, takings with only an "incidental" public benefit—like helping to keep economically vulnerable, unvaccinated renters housed— "are forbidden by the Public Use Clause." *Kelo*, 545 U.S. at 490 (Kennedy, J.,

concurring). Because the taking here is designed simply "to benefit a particular class of identifiable individuals," it is not for a "public use" and is void. *Id.* at 478.

### 3. The Moratorium Unlawfully Applies Outside the Unincorporated Areas

The County hangs its hat on a nonbinding 1979 Attorney General's Opinion for the proposition that, under Government Code section 8634, a county's authority may extend beyond the unincorporated areas within its borders. In the process, it casts aside a controlling constitutional provision and case law that say the opposite.

The California Constitution clearly states that "[a] county or city may make and enforce ***within its limits*** all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7 (emphasis added). The County brushes this off, claiming that, because cities are within its "limits," it can regulate cities. But that's not how the courts have interpreted the constitutional provision. In *County Sanitation Dist. No. 2 v. County of Kern*, 127 Cal. App. 4th 1544 (2005), a California Court of Appeal interpreted Article XI, section 7, of the California Constitution as strictly limiting the powers of Kern County (and by extension all counties in the State): "The incorporated areas of Kern County are necessarily outside the jurisdiction and authority of County; County's authority extends only to the unincorporated areas within its borders." *Id.* (citing Cal. Const., art. XI, § 7).

The Court of Appeal in *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264 (1993) agreed. There, Alameda County voters passed Measure D, which purported to regulate solid waste in "both the incorporated and unincorporated areas" of the County. *Id.* at 274. The Court held that, to the extent it went beyond

22

the unincorporated areas, the measure was unconstitutional: "the California Constitution specifies that the police power bestowed upon a county may be exercised 'within its limits,' i.e., only in the unincorporated area of the county." *Id.* at 274-75 (quoting Cal. Const., art. XI, § 7); *see also In re Knight*, 55 Cal. App. 511, 513-14 (1921) (county ordinances effective only within county borders); *Ex parte Pfirrmann*, 134 Cal. 143, 145 (1901) (county and city have mutually exclusive jurisdiction); *Ex parte Roach*, 104 Cal. 272, 275 (1894) (city ordinances supersede ordinances of its county upon same subject).

It does not matter, as the County contends, that these cases purportedly involved "local" issues and did not involve Government Code section 8634. Even if section 8634 itself extended a county's jurisdiction beyond the unincorporated areas within its borders (which it does not), it would be unconstitutional. The reason is simple: "Constitutions trump conflicting statutes." *Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.*, 209 Cal. App. 4th 1182, 1189 (2012). The 1979 Attorney General's Opinion does not alter that fact.

### III. CONCLUSION

For the foregoing reasons, the Court should reverse the district court with instructions to grant SCRHA's preliminary injunction motion.

Date: October 12, 2021                    Respectfully submitted,

*s/* Paul J. Beard II
PAUL J. BEARD II
*Attorney for Appellant*
SOUTHERN CALIFORNIA RENTAL
HOUSING ASSOCIATION

23

## CERTIFICATE OF COMPLIANCE

I am the attorney of record in this case.

**This brief contains 6128 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature:** s/ Paul J. Beard II                       **Date:** October 12, 2021
              PAUL J. BEARD II